## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

HABBO G. FOKKENA,
United States Trustee,

                Appellant,

v.

DANA M. HARTWICK,

                Appellee.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 06-4433 (MJD)

_____

Michael E. Ridgway, Office of the United States Trustee, Counsel for Appellant.

John D. Lamey, III, and Ryan M. Pacyga, Lamey & Pacyga, PA, Counsel for Appellee.

_____

## I.   INTRODUCTION

This matter is before the Court on Appellant Habbo G. Fokkena's appeal of the bankruptcy court's Order entered October 13, 2006, denying the United States Trustee's motion to dismiss. The stated issue on appeal is whether the bankruptcy court erred by denying the United States Trustee's motion to dismiss the Debtor's bankruptcy case under 11 U.S.C. § 707(b)(1), based on the presumption of abuse as determined under 11 U.S.C. § 707(b)(2). The parties address the following two issues:

1.  Whether, under 11 U.S.C. § 707(b)(2)(A)(ii), a debtor qualifies for an expense allowance referred to as "ownership costs" under the Local Transportation Standards issued by the Internal Revenue Service for a vehicle that is owned free and clear of liens.

1

2.      Whether, under 11 U.S.C. § 707(b)(2)(A)(iii), a debtor qualifies for an expense allowance for payments on secured debts when no payments will be made because the debtor intends to surrender the property securing the debt.

The Court heard oral argument on June 22, 2007.

## II.    FACTUAL BACKGROUND

On June 12, 2006, Appellee Dana M. Hartwick ("Hartwick" or "Debtor")

filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

Also on June 12, 2006, in connection with her petition, Hartwick filed

schedules itemizing her assets and liabilities, an Official Form B22A, and a Chapter

7 Individual Debtor's Statement of Intention.  Official Form B22A is the Statement

of Current Monthly Income and Chapter 7 Means Test Calculation, commonly

referred to as the "means test form" that Chapter 7 debtors with primarily

consumer debt are required to file.  These documents disclosed:

Hartwick identified an ownership interest in her residence located in Woodbury,

Minnesota.  (Schedule A.)  (On November 7, 2006, she filed a notice of change of

address, indicating that she no longer lived at that address.)  Hartwick indicated

that she owned one automobile, a 2000 Hyundai Tiberon.  (Schedule B.)  She

indicated that her Woodbury home was secured by a first mortgage of

$133,913.96 and a second mortgage of $14,569.42, but did not identify any lien

on her automobile.  (Schedule D.)  She also indicated her intention to surrender

her interest in her Woodbury residence.  (Chapter 7 Individual Debtor's Statement

2

of Intention.)

On June 30, 2006, the holder of the first mortgage on the Debtor's home filed a motion with the bankruptcy court to permit foreclosure proceedings.  It argued that Hartwick had not made the required payments for May 2006 and June 2006.  On July 24, 2006, the bankruptcy court authorized the mortgage holder to pursue foreclosure proceedings under state law.

On August 11, 2006, Appellant the United States Trustee Habbo Fokkena ("Trustee") filed a motion to dismiss the case under 11 U.S.C. § 707(b), on the grounds that it would be an abuse of Chapter 7 to grant a discharge to the Debtor because she had sufficient disposable income to repay her unsecured creditors at least $473.71 per month.  11 U.S.C. § 707(b)(2).  Specifically, the Trustee argued that the Debtor did not qualify for allowances for certain expense amounts, including (1) vehicle ownership costs under the Local Standards issued by the Internal Revenue Service for a vehicle she owns free of any liens and on which she is not making a monthly loan or lease payment; and (2) average monthly mortgage payments on the Debtor's residence that she had ceased making and would never make in the future because she planned to surrender her residence to secured creditors.

On September 12, 2006, the Debtor filed a second amended Official Form B22A resulting in a negative monthly disposable income of $411.57, indicating

that the presumption of abuse did not arise.

On September 14, 2006, the bankruptcy court held a hearing on the Trustee's motion to dismiss. The parties agree that whether the presumption of abuse arose depended on whether Hartwick was entitled to expense allowances for vehicle ownership costs and average payments to secured creditors. Hartwick sought to subtract $471 from her current monthly income as a vehicle ownership cost although she does not make monthly loan or lease payments on her vehicle. She also sought to subtract monthly mortgage payments of $1,423.25, although she had made no mortgage payment since April 2006 and had indicated her intent to surrender the residence, and the mortgage holder had obtained an order allowing it to pursue foreclosure remedies under state law.

On October 13, 2006, the bankruptcy court denied the Trustee's motion. In re Hartwick, 352 B.R. 867, 870 (Bankr. D. Minn. 2006). The court concluded that the statute authorized Hartwick to reduce her current monthly income by both the Local Standard for vehicle ownership costs for one car and the average monthly amount of mortgagee payments on her surrendered residence.

The Trustee filed the current appeal. The Trustee requests that, if the Court concludes that Hartwick is not eligible for either of the two expense categories, the Court remand the case to the bankruptcy court for recalculation under the means test without deductions for those expenses.

4

### III.    DISCUSSION

#### A.    Standard of Review

This Court reviews the bankruptcy court's findings of fact for clear error and

its legal conclusions and conclusions involving mixed questions of law and fact de

novo.  DeBold v. Case, 452 F.3d 756, 761 (8th Cir. 2006).

#### B.    Means Testing under 11 U.S.C. § 707(b)(2)

In a Chapter 7 bankruptcy case, trustees liquidate a debtor's non-exempt

assets to pay creditors and then the debtor receives a discharge of her debts.

> Section 707(b) of the Bankruptcy Code was enacted in 1984. . . .  The
> purpose for the amendment to section 707(b) was to limit the
> chapter 7 bankruptcy remedy for consumer debtors to those debtors
> who are honest and who need the remedy to preserve a decent
> standard of living for themselves and their dependents.  By this
> enactment, persons who have primarily consumer debts and who
> have financial resources in excess of their basic needs would be
> forced to seek relief under a reorganization chapter or to otherwise
> attempt to repay their creditors.

In re Goddard, 323 B.R. 231, 233-34 (Bankr. S.D. Ohio 2005) (citation omitted).

On October 17, 2005, the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005 ("BAPCPA") took effect.  The BAPCPA, among other

things, amended § 707(b) of the Bankruptcy Code, which governs dismissal of

Chapter 7 bankruptcy cases.  One of the purposes of the amendment was to curb

abuse by dismissing cases filed by Chapter 7 debtors who seek discharge of their

debts even though they have the ability to repay their creditors and, thus, file

under Chapter 13, under which debtors usually repay some or all of their debts. 151 Cong. Rec. S1856 (Mar. 1, 2005) (statement of Sen. Charles Grassley), quoted in Eugene R. Wedoff, Means Testing in the New § 707(b), 79 Am. Bankr. L.J. 231, 231 (2005).

The BAPCPA amended § 707(b) to replace a presumption in favor of granting discharge with a presumption that a case was an abuse of Chapter 7 if a mathematical formula set out in the statute, referred to as the "means test," yields a minimum amount of monthly disposable income. The means test calculates the debtor's current monthly income, as defined under 11 U.S.C. § 101(10A), ("CMI") based on the debtor's average income for the six months preceding the month of the bankruptcy filing. If the debtor's monthly disposable income, after reducing the CMI by allowed expenses under § 707(b)(2)(A)(ii)-(iv), is more than a particular amount, the presumption of abuse arises.

The United States Trustee is required to review all materials filed by the debtor. 11 U.S.C. § 704(b). If the Trustee determines that the presumption of abuse arises and the debtor's income is not less than the median family income in the debtor's state, the Trustee is required to either file a motion to dismiss the bankruptcy case or file a statement setting forth the reasons the Trustee does not consider a motion to dismiss to be appropriate.

In this case, the issue is whether the Debtor qualifies for expense allowances

for two expense categories: vehicle ownership costs under Local Standards issued

by the IRS and average monthly future payments on account of secured debts.

### C.   Whether an Ownership Costs Expense Allowance Applies to Vehicles Owned Free of Liens

#### 1.   Introduction to Vehicle Ownership Costs

Under § 707(b)(2)(A)(ii)(I), a debtor's monthly expenses under the means

test "shall be the debtor's applicable monthly expense amounts specified under the

National Standards and Local Standards, and the debtor's actual monthly

expenses for the categories specified as Other Necessary Expenses issued by the

Internal Revenue Service for the area in which the debtor resides, as in effect on

the date of the order for relief. . . ."  The IRS Local Standards, found in the

Internal Revenue Service Financial Analysis Handbook, include both

transportation and housing related expenses.  The IRS Local Standards apportion

transportation expenses into two components, one related to the costs associated

with financing vehicle acquisition, which the IRS refers to as "ownership costs,"

and the other component associated with the costs of vehicle operation, which the

IRS refers to as the "operating costs."  IRS Collection Financial Standards,

available at http://www.irs.gov/individuals/article/0,,id=96543,00.html.  The

transportation ownership cost is standardized to be $471 for the first car and $338

for the second car.  IRS Allowable Expenses for Transportation, available at

http://www.irs.gov/businesses/small/article/0,,id=104623,00.html.

The Trustee asserts that, before the specific IRS expense amounts may be included in the debtor's allowed monthly expenses, the expense itself must first be applicable to the debtor.  In other words, the vehicle ownership cost will not apply unless a loan or lease payment obligation actually exists.  Hartwick asserts that she can deduct the car ownership expense even if she does not make a monthly car payment because she owns a car.

### 2.    Plain Language of the Statute

"The starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes.  It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms."  Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (citations omitted).

Hartwick asserts that the plain language of the statute provides that debtors are permitted to claim the Local Standards ownership expenses based on the number of vehicles they own, rather than on the number for which they make payments.  She argues that, with respect to car ownership expense, the term "applicable" in the phrase "applicable monthly expense amounts" relates to a determination of the number of vehicles owned by the debtor and the column to use in finding the appropriate figure in the Local Standards table – First Car or Second Car.  Hartwick claims that "applicable" does not mean "actual," a term

Congress uses in the same sentence.  11 U.S.C. § 707 (b) (2) (A) (ii) (I)  ("The debtor's monthly expenses shall be the debtor's **<u>applicable</u>** monthly expense amounts specified under the National Standards and Local Standards, and the debtor's **<u>actual</u>** monthly expenses for the categories specified as Other Necessary Expenses . . .")  (emphasis added).

The Court agrees that, by using the two terms in the same sentence, Congress signaled its intention that "applicable" and "actual" have different meanings.  However, "that does not mean that Congress, by using two different adjectives, meant that the two terms must have essentially <u>opposite</u> meanings."  <u>In re Ross-Tousey</u>, – B.R. –, 2007 WL 1466647, at *3 (E.D. Wis. May 21, 2007).  Rather, "it is true that the debtor's 'actual' expense does not control the <u>amount</u> of the deduction, but the debtor must still have <u>some</u> expense in the first place before the Standard amount becomes 'applicable.'  The term 'applicable' merely means, in this context, that when a debtor has an automobile ownership expense, his deduction is not based on that actual expense but on the applicable expenses listed in the Standards."  <u>Id.</u>

> For some expenses, the statute allows debtors to take their exact (actual) deductions.  For other expenses, such as car ownership expenses, the statute's fixed deduction simply treats all debtors who make car payments the same.  In other words, the statute allows debtors to itemize certain of their expenses with particularity, but it does not care whether a debtor drives a Mercedes or a Mercury.  This reading gives meaning to the important distinction between 'applicable' and 'actual' without taking the further, unwarranted, step

of concluding that the expense may be applicable even though it does
not even exist.

Id. at *4.

The Court concludes that the plain meaning of the word "applicable" in the
phrase "monthly expenses shall be the debtor's applicable monthly expense
amounts specified under the . . . Local Standards," means that, before the expense
amount can be included in the debtor's allowed monthly expenses, the expense
itself must actually be applicable to the debtor – in other words, the debtor must
actually have a loan or lease payment obligation.

Following IRS policy, if the debtor has no loan or lease payment obligation,
then the vehicle ownership cost is not applicable and only the operating cost
expense applies; if the debtor has a loan or lease payment obligation, then both
the ownership cost and the operating cost are applicable and are applied in the
dollar amount specified by the IRS.  See, e.g., In re Barraza, 346 B.R. 724, 728-29
(Bankr. N.D. Tex. 2006) (holding debtor not entitled to standard ownership
allowance for vehicle owned free of loan or lease payment).

### 3.    IRS Definition of Standards

Additionally, in order to determine whether the expense Standards issued
by the IRS are "applicable," the most logical resource to consult is the IRS.  See,
e.g., In re Slusher, 359 B.R. 290, 309 (Bankr. D. Nev. 2007) ("Congress' decision to
use the IRS standards within the Bankruptcy Code strongly suggests that courts

should look to how the IRS determined those standards; that is, as to how the IRS

would have applied them in similar circumstances.") (footnote omitted).

In the IRS Collection Financial Standards, under the heading

"Transportation," the IRS provides:

> The transportation standards consist of nationwide figures for
> monthly loan or lease payments referred to as ownership costs, and
> additional amounts for monthly operating costs broken down by
> Census Region and Metropolitan Statistical Area (MSA). Public
> transportation is included under operating costs. A conversion chart
> has been provided with the standards which shows which IRS
> districts fall under each Census Region, as well as the counties
> included in each MSA. The ownership cost portion of the
> transportation standard, although it applies nationwide, is still
> considered part of the Local Standards.
>
> The ownership costs provide maximum allowances for the lease or
> purchase of up to two automobiles if allowed as a necessary expense.
> The operating costs are derived from BLS data.
>
> If a taxpayer has a car payment, the allowable ownership cost added
> to the allowable operating cost equals the allowable transportation
> expense. **If a taxpayer has no car payment, or no car, only the**
> **operating costs portion of the transportation standard is used to**
> **come up with the allowable transportation expense.**

IRS Collection Financial Standards, <u>available at</u>

http://www.irs.gov/individuals/article/0,,id=96543,00.html (emphasis added).

The IRS's Internal Revenue Manual supports this interpretation because it

requires the taxpayer to have an actual loan or lease payment obligation on a

vehicle before the Local Standard ownership cost applies:

> The transportation standards consist of nationwide figures for loan or

11

lease payments referred to as ownership cost, and additional amounts for operating costs. . . .  If a taxpayer has a car payment, the allowable ownership cost added to the allowable operating cost equals the allowable transportation expense.  If a taxpayer has no car payment only the operating cost portion of the transportation standard is used to figure the allowable transportation expense.  Under ownership costs, separate caps are provided for the first car and second car.  If the taxpayer does not own a car a standard public transportation amount is allowed.

Internal Revenue Service Manual, Financial Analysis Handbook, Pt. 5, ch. 15,

§ 5.15.1.7(4.B), <u>available at</u>

http://www.irs.gov/irm/part5/ch15s01.html#d0e182771.

In fact, the IRS calculates the "ownership cost" based on the "five-year average of new and used car financing data compiled by the Federal Reserve Board of Governors."  IRS Collection Financial Standards.  Thus, the ownership costs is intended to account for the reasonable expense of financing a vehicle over five years and is not applicable if a debtor has no such acquisition financing expense.

The Court agrees that,

[h]ad Congress intended to indiscriminately allow all expense amounts specified in the National and Local Standards, it would have written 707(b)(2)(A)(ii)(I) to read, "The debtor's monthly expenses shall be the monthly expense amounts specified under the National Standards and Local Standards . . ." rather than "The debtor's monthly expenses shall be <u>the debtor's applicable</u> monthly expense amounts specified under the National and Local Standards . . .

<u>Slusher</u>, 359 B.R. at 309 (citation omitted).

Congress has deemed transportation and car ownership to be among the necessities of life that a debtor is entitled to fund before he must pay back his creditors. Thus, the statute excludes these amounts from the monthly pot of money that the creditors can get their hands on. What's important, therefore, is not <u>how many</u> cars a debtor owns, but how many cars he makes <u>payments</u> on every month – it is only the <u>payments</u> that affect the debtor's ability to repay his creditors. The statute is only concerned about protecting the debtor's ability to continue owning a car, and if the debtor <u>already</u> owns the car, the debtor is adequately protected. Section 707(b)(2)(A)(ii)(I) only achieves the statute's goal of protecting debtors' ability to fund the necessities of life when the debtor is actually shouldering a monthly auto expense. When the debtor has no monthly ownership expenses, it makes no sense to deduct an ownership expense to shield it from creditors.

<u>In re Ross-Tousey</u>, 2007 WL 1466647, at *4.

### 4. Policy Implications

Hartwick argues that limiting the ownership allowance to debtors who make car payments will have a disparate impact on those debtors who are more likely to purchase older, used cars. She also asserts that a car for which the debtor no longer makes payments is more likely to require major repairs or replacement. The operating cost component under the Local Standards includes insurance, registration fees, normal maintenance, fuel, parking, and tolls. Internal Revenue Manual § 5.19.1.4.3.4. Hartwick notes that operating costs do not include major repairs. However, additional repair costs may be offset by the additional $200 permitted under the Internal Revenue Manual for older and high mileage cars. Additionally, the argument that limiting the ownership allowance to debtors who

make car payments  will have a disparate impact on debtors "ignores the fact that the means test merely creates a [rebuttable] presumption of abuse." <u>In re Barraza</u>, 346 B.R. 724, 729 (Bankr. N.D. Tex. 2006).

Hartwick also argues that allowing all debtors to deduct the ownership allowance avoids arbitrary distinctions.  She provides the following hypothetical: Debtor A and Debtor B own vehicles of the same make, model, and year.  Debtor A paid off her car loan the month before filing while Debtor B has one payment remaining after filing.  Hartwick asserts that, under the Trustee's theory, Debtor B is entitled to a car ownership allowance but Debtor A is not.

While the Court agrees that the distinction in Hartwick's hypothetical does appear to be somewhat arbitrary, a line must be drawn somewhere, and any interpretation will result in some unfairness.  Under Hartwick's interpretation of the statute, debtors who own two unusable cars rusting in their back yard would be entitled to the windfall benefit of both ownership and operating expense deductions although they, in fact, incur no expenses by owning the vehicles.  <u>In re Ross-Tousey</u>, 2007 WL 1466647, at *6.  <u>See also</u> <u>In re Howell</u>, 366 B.R. 153, 157 (Bankr. D. Kan. 2007) ("Allowing debtors to deduct from their disposable income a fictional ownership allowance would give debtors with unencumbered vehicles a windfall at the expense of their unsecured creditors.").  Hartwick's hypothetical does not give the Court a basis for ignoring the plain language of the statute.

The Court understands the bankruptcy court's frustration with the BAPCPA, which is a poorly written statute; however, the Court's task is to interpret the statute as Congress has written it.  In this case, the plain language of the statute requires that "[t]he term 'applicable' merely means, in this context, that when a debtor has an automobile ownership expense, his deduction is not based on that actual expense but on the applicable expenses listed in the Standards. . . . [I]f a debtor does not own or lease a vehicle, the ownership expense is not 'applicable' to that debtor."  In re Ross-Tousey, 2007 WL 1466647, at *3 (citation omitted).  In this case, the ownership expense is not applicable to Hartwick.  The bankruptcy court's Order is reversed to the extent that it found that Hartwick was entitled to subtract the ownership expense from her CMI.

**D.    Whether an Expense Allowance Applies to Payments on Secured Debt when the Debtor Intends to Surrender the Property Securing the Debt**

**1.    Introduction to Mortgage Deduction**

Under § 707(b)(2)(A)(iii), "[t]he debtor's average monthly payments on account of secured debts shall be calculated as the sum of – (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition . . . divided by 60."  Hartwick included her monthly mortgage payments of $1,423.25 on her Second Amended Official Form B22A, although she had stopped making payments two months

earlier and had indicated her intent to surrender her homestead property.  The

bankruptcy court authorized Hartwick to reduce her CMI by the amounts she

would have had to pay had she retained the mortgage and continued making

monthly payments on the property.

The Trustee asserts that Hartwick cannot deduct this amount because it

was not "scheduled as contractually due."  He notes that Hartwick had not made a

payment for months before filing bankruptcy; had notified the bankruptcy court

that she would be surrendering her residence; disclosed in her bankruptcy papers

that she had no intention of making any monthly mortgage payments post-

petition; and vacated the premises on November 7, 2006.

### 2.    Statutory Language

When interpreting a statute, the Court starts with the statute's plain

language.  Watson v. Ray, 192 F.3d 1153, 1155 (8th Cir. 1999).  "When no specific

definition for a term is given in the statute itself, [the Court] look[s] to the

ordinary common sense meaning of the words.  Absent clearly expressed

legislative intent to the contrary, the language is regarded as conclusive."  Id. at

1156 (citations omitted).

The Trustee argues that the plain meaning of the statute supports his

interpretation.  The Trustee asserts that the word "scheduled" and the phrase "in

each of the 60 months following the date of the petition" should be read to have

equal meaning.  See Negonsott v. Samuels, 507 U.S. 99, 106 (1993) (noting that

when interpreting a statute, courts should give "effect to every clause and word of

[the] statute") (citation omitted).  The Trustee concludes that the only relevant

amounts are not just those that are contractually due, but those that are also due

"in each month of the 60 months following the date of the petition."  See In re

Skaggs, 349 B.R. 594, 600 (Bankr. E.D. Mo. 2006) ("To focus on the single term

'contractually due' without due consideration of the import of the term

'scheduled' and the phrase 'in each of the 60 months following the date of the

petition' will miss the actual meaning and the intent of § 707(b)(2).  A primary

intent of Congress in the passage of BAPCPA was to ensure that those debtors who

can pay their debts do so.").

The Trustee also argues that Congress uses the phrase "scheduled as"

several times in the Bankruptcy Code to refer not to the common dictionary

meaning of the word "schedule," to plan for a certain date, but rather to signify

whether a debt is identified on a debtor's bankruptcy schedules.  See, e.g., 11

U.S.C. § 1111(a) ("A proof of claim or interest is deemed filed under section 501

of this title for any claim or interest that appears in the schedules filed under

section 521(1) or 1106(a)(2) of this title, except a claim or interest that is

scheduled as disputed, contingent, or unliquidated.").

The Trustee also argues that "scheduled as contractually due" does not

mean those debts scheduled as contractually due as of the petition date based on

the debtor's historical expenses.  He claims that expenses should be forward-

looking.  <u>See</u> <u>In re Love</u>, 350 B.R. 611, 614 (Bankr. M.D. Ala. 2006) ("[T]he means

test is based upon historic income figures.  Section 101(10A) clearly indicates that

the term current monthly income is the average of the debtor's income for six

months preceding the date of the petition.  But the language used on the expense

side of the equation is all forward looking.  The terms 'projected disposable

income,' § 1325(b)(1)(B), and 'scheduled' payments both indicate a forecast of

future events and not historic data.").

The Court concludes that the plain language of § 707(b)(2)(A)(iii) dictates

that a debtor must be permitted to deduct secured payments on property even if

that debtor intends to surrender that property post-petition.

The Court rejects the Trustee's argument that "scheduled as" should be

interpreted as a term of art under the Bankruptcy Code meaning that the expense

will appear on a schedule.  As the court cogently explained in <u>In re Randle</u>, 1:07-

cv-631, slip op. at 11-12 (N.D. Ill. July 20, 2007), the only other place in the

Bankruptcy Code that uses the phrase "scheduled as" also explicitly refers to

bankruptcy schedules before using the phrase "scheduled as" in the same

sentence.  <u>See</u> 11 U.S.C. § 1111(a).  In other portions of the Bankruptcy Code,

when Congress used the terms "scheduled" or "schedule" and explicitly referred to

a bankruptcy schedule through reference to 11 U.S.C. § 521(a)(1), the term of art meaning applied, but when Congress used the terms "schedule" or "scheduled" without explicitly referring to bankruptcy schedules, the statute clearly intended "schedule" to have its ordinary meaning.  In re Randle, slip op. at 11-12.  In this case, § 707(b)(2)(A)(iii) does not refer to bankruptcy schedules at all, and there is no bankruptcy schedule that requires a debtor to list "all amounts contractually due to secured creditors in each month of the 60 months following the date of the petition."  Id. at 12 (citation omitted).

Moreover, there is no conditional language in § 707(b)(2)(A)(iii) that requires that a debtor must intend to continue to pay the contractually due amounts in order to claim the expense, and a debtor's intent to surrender her collateral does not alter her contractual obligation to make payments.  In re Randle, slip op. at 13.

Additionally, this section specifically addresses secured debt payments rather than general expenses.  "If Congress intended to limit secured debt payments contractually due from debtors on the petition date to those where actual future payments will be made in Form B22C calculations, it knew how to do so, as reflected, for example, by the inclusion of the terms 'actual monthly expenses' and 'actual expenses' elsewhere within section 707(b)(2)(A)(ii)(I) and (II)."  In re Oliver, No. 06-30076RLD13, 2006 WL 2086691, at *3 (Bankr. D. Or.

June 29, 2006) (unpublished).

Finally, the Court rejects the Trustee's assertion that the Court should find

that the means test is forward-looking and, thus, ignore the plain language of the

statute.  The Court concludes that the plain language of the section at issue is

clear.  Also, the Court concludes that the means test is aimed at capturing a

"'snapshot' of the debtor's financial state as of the date the petition is filed," rather

than at constructing a forward-looking analysis of the debtor's financial situation.

See, e.g., In re Randle, 1:07-cv-631, slip op. at 14-15 (N.D. Ill. July 20, 2007).

### 3.    Legislative History

The Trustee admits that the legislative history of § 707(b)(2)(A)(iii) does

not specify whether it is the existence of a contractual obligation on the petition

date or a present intention to make payments that is determinative of eligibility.

However, he argues that Congress's general goal behind amending § 707(b) was

to ensure "that those who can afford to repay some portion of their unsecured

debts be required to do so."  The Trustee concludes that, by completing Form

B22A, the debtor is roughly estimating the amount of monthly disposable income

available and whether it is above the threshold amount deemed to be a

meaningful repayment to unsecured creditors.  This estimate is designed to steer

debtors who have monthly disposable income above the threshold amount to file

their petition under Chapter 13 instead of under Chapter 7.  He concludes that the

Form B22A only has utility if the debtor is required to estimate the residual income available each month after the deduction of the projected monthly expenses at the time the case is filed.  The Trustee asserts that excluding from the means test monthly payments the debtor has no intention of paying would "'ensure that debtors repay creditors the maximum they can afford,' a primary goal of BAPCPA."  In re Lenton, 358 B.R. 651, 660 (Bankr. E.D. Pa. 2006) (quoting H.R. Rep. 109-31, pt. 1 at 1, as reprinted in 2005 U.S.C.C.A.N. 88, 89 (2005)).

First, the Court notes, as previously stated, that "[t]he starting point in discerning congressional intent is the existing statutory text," and "[i]t is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms."  Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (citations omitted).  The Court has already determined that the plain language of the statute requires that a debtor be permitted to claim an expense allowance for payments on secured debts that are contractually due, regardless of whether she intends to surrender the property securing the debt.

Second, Congress had more than one purpose when creating the means test.  Not only did Congress seek to require debtors to repay as much of their debts as they could, but also, it sought to "to create a 'mechanical' formula for presuming abuse of Chapter 7."  In re Randle, 358 B.R. 360, 363 (Bankr. N.D. Ill.

2006) (citations omitted).  This intent is visible throughout § 707(b)(2) where most expenses to be deducted are based on IRS Standards rather than on actual expenses. § 707(b)(2); see also In re Randle, 358 B.R. at 364.  The Trustee's interpretation of § 707(b)(2)(A)(iii) would require bankruptcy courts to conduct an individualized inquiry into each debtor's intent and individual circumstances, which would be at odds with Congress's purpose of creating a mechanical means test.

The Court affirms the bankruptcy court's interpretation of § 707(b)(2)(A)(iii).  Congress did not state that the subsection at issue applied only to payments estimated to be actually paid, even though it used the term "actual" elsewhere in the statute.  A natural reading of subsection (iii)(I) is that it applies to payments that the debtor is under contract to make, and Hartwick was still under a contractual obligation to pay her mortgage at the time she filed her bankruptcy petition and at the time the Trustee filed the motion to dismiss.

Based on the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1. The bankruptcy court's Order denying the Trustee's motion to dismiss the Debtor's bankruptcy case under 11 U.S.C. § 707(b), filed October 13, 2006, is **REVERSED IN PART** and **AFFIRMED IN PART** as follows:

   a. The bankruptcy court's Order is reversed with regard to its holding that, under 11 U.S.C. § 707(b)(2)(A)(ii), a debtor

qualifies for an expense allowance referred to as "ownership costs" under the Local Transportation Standards issued by the Internal Revenue Service for a vehicle that is owned free and clear of liens.

b.   The bankruptcy court's Order is affirmed with regard to its holding that, under 11 U.S.C. § 707(b)(2)(A)(iii), a debtor qualifies for an expense allowance for payments on secured debts when no payments will be made because the debtor intends to surrender the property securing the debt.

2.   This matter is **REMANDED** to the bankruptcy court for recalculation under the means test, consistent with this Order.

Dated: August 20, 2007                    s / Michael J. Davis
                                          Judge Michael J. Davis
                                          United States District Court